Case number 25-5314. Michael Abramowitz in his official capacity as director of Voice of America et al. versus Kari Lake in her official capacity as senior advisor to the acting CEO of the United States Agency for Global Media et al. appellant. Ms. Hedges for the appellant. Mr. Schultz for the appellate. Good morning, counsel. Ms. Hedges, please proceed when you're ready. Thank you, your honor. Good morning, your honors may leave the court. Elizabeth Hedges on behalf of the United States. I would like to reserve 4 minutes for rebuttal. In Elgin versus Department of the Treasury, the Supreme Court held that a challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the federal circuit within the Civil Service Reform Act scheme. There's no dispute in this case that the Voice of America director Michael Abramowitz is an inferior executive officer to whom the CSRA would generally apply. And there's no dispute that he's challenging his removal from that office, but the district court held that it had jurisdiction over the director's challenge to his removal, even though the CSRA provides the exclusive remedial scheme for claims within its scope. That decision was incorrect and the court should reverse. The parties agree that under Thunder Basin's 2-step framework, the CSRA provides the exclusive avenue for suit to a plaintiff whose claims fall within its scope. But the plaintiffs argue that this claim is collateral and not the type that Congress intended to channel because the government raises a structural constitutional challenge to the removal restriction in section 6205E1. But in Elgin, the Supreme Court rejected an exception to CSRA exclusivity for facial or as applied constitutional challenges to federal statutes. The availability of administrative and judicial review under the CSRA generally turns on the type of civil service employee and the type of adverse employment action at issue. That's the opinion in Elgin at page 12. It does not turn. Ms. Hedges, that what we're trying to ascertain here is congressional intent. And here we have a very specific statute that Congress passed to preserve the independence of the voice of America. And Congress passed a statute that said, in order to remove someone like Mr. Abramowitz, you have to get the approval of this board, a special board. And that board didn't have a quorum and his removal was instigated without that type of approval. And it seems to me that if you're looking at the type of claim that Mr. Abramowitz is bringing, and that statutory backdrop, it's hard to say that Congress would have intended that that claim be channeled. Because the purpose of that statute was to ensure that before the head of the voice of America could be removed, there had to be approval. And if you channel this, he will be removed without approval because the MSPB has no ability to ensure an injunction. There would be a long, lengthy process before the merits could be addressed. And so it just seems very hard when you look at the overarching purpose of Thunder Basin and our analysis here to say that Congress would have intended that this claim be channeled. So, your honor, I respect, I respectfully disagree with that. The fact that Congress put a substantive removal restriction in the statute doesn't say anything about where those claims challenging. The removal allegedly in violation of that restriction should be heard in the 1st instance and in Elgin and also followed by this court in in 2019, both of those courts recognize that meaningful judicial review is not unavailable. Just because they claim is channeled and then I'm trying to focus on the particular statutory trap. Backdrop of this case, which is the statute that was specifically passed to preserve independence and prevent the removal of the director of voice in America without this approval in order to preserve independence. And it seems that the purpose of that statute would be initiated if you channel, because if you channel to the MSPB, there can be no interim relief. He is removed without the. The approval of the board, and that lasts for a long period of time before that that can be resolved for the MSPB. Can you focus on this particular statute? Yes, your honor. So, this particular statute does not say where a challenge to removal under one way or the other. And so we're trying to ascertain intent. Right? Your honor. And so it doesn't deviate from the scheme in the that provides that for this type of employee, making this type of challenge, it gets channeled. And something I would point out is that is this court noted in even if a claim or a claimant might never be able to get certain types of relief or review. That doesn't mean a claim doesn't get channeled as long as it's eventually able to get judicial review in a form like the federal circuit. So, and all that, I'm just trying to focus on this particular statute. And is there any clue that Congress wouldn't want this channeled the fact that that Congress didn't provide a specific remedial scheme for these types of challenges? I mean, if you look at the type of relief that Mr. Abramowitz is seeking, he could seek free and statement before the MSPB. And I understand that there would be a period of time before that's adjudicated. But that's the case as a general default matter. In any litigation, preliminary interim relief is the exception or interim relief of any kind of the exception. So, the fact that a process would need to take place before he gets a final adjudication doesn't change the default system that Congress did not alter in Title 22 when it enacted the substantive removal restriction. If the same claim, type of claim that was raised in Axon or in Free Enterprise were presented by the MSPB, like, if Congress passed a statute and said for cause removal, it's everybody there. And Abramowitz wanted to raise a challenge saying, I can't be subjected to that because it's not sufficiently accountable to the executive. Do you read Elgin because of its breadth as supporting a different result there, notwithstanding Axon and Free Enterprise? Your Honor, I read Axon and Elgin as consistent. And if we had a case where Mr. Abramowitz was challenging the constitutionality of the MSPB process itself, we would be in a world that looks a lot more like Axon. But the court in Axon expressly explained why that was a different type of injury. It was an almost unique circumstance where the plaintiffs were challenging the constitutionality of the very process through which their grievances would ordinarily be challenged. Just to be clear, in your view, in that situation, Axon, Free Enterprise would say that, no, those claims don't get challenged, notwithstanding Elgin. And when you say those claims, Your Honor, I just want to make sure I understand. Claims like the claims in each of those cases, if the law and the facts were different in terms of the composition of the MSPB. So that it was like in Axon, the complaint was that the LJs were insulated from presidential supervision by for cause protections, right? Right, and they were unaccountable. Yeah, they were unaccountable. And in Free Enterprise, it was that there were, there was not only for cause protection, but there were two layers. So, all I'm saying is, if there was that kind of claim, the broad wording of Elgin doesn't mean it would come out differently from how those cases came out. So, if I'm understanding correctly, I don't think Elgin would come out any differently now than it did before Axon. And I think that if the MSPB, let's say, had the same, the members in the same removal protections that the ALJs in Axon had, then it would come out differently because of Axon. It might, Your Honor, but I don't know that it would be because of Axon, because again, I think it would depend on the type of claim being brought. So, the court's analysis is if the claim were a claim, I can't be subjected to that because it violates the separation of powers. It might be, Your Honor. That's not the case we have here. No, no, I understand. I'm trying to understand the logic of your position. So, do you have an answer to that question? I thought your answer was, well, what is your answer? I think that if Mr. Abramos were saying, I can't be subjected to the MSPB process because whatever it may be, they're unaccountable. They're not sufficiently in check by another authority, then we would have a case that looks more like Axon. And so, I assume if the Supreme Court had that case, they would look at the facts of that case, but it would look different from Elgin. It would look more like Axon and it would be very different from what we have here. So, this, as you pointed out in the briefing, the issue in the shoe is on the other foot here in the sense that the Article 2 claim is being made by the government rather than by the plaintiff. But the plaintiff is also bringing a separation of powers sort of assertion that Congress has the authority to impose this removal regime. Constitutional authority to do that consistent with free enterprise, Axon, whatever cases is the fact that the same issue, the same kind of question about decision maker and the constitutionality of the decision maker is presented. Doesn't that at least indicate that this is beyond the expertise of the MSPB, just as it was beyond the expertise of the administrative bodies in Axon and free enterprise? No, Your Honor, and I would again point out that in AFI and Elgin, this court and the Supreme Court respectively address this issue of what is what is this expertise inquiry require? And all it requires is that the MSPB's expertise may be brought to bear on these types of claims. And I'm paraphrasing, but because I don't have the exact text in front of me, but maybe brought to bear. It's not that in this every case, the MSPB's expertise is necessarily required in order to reach the constitutional issue. And an example would be in Elgin. If you look at, I believe it's the last few pages of the majority opinion in Elgin, the court is talking about what types of threshold issues might come up in these types of cases. It doesn't say that this claimant's claim necessarily raises those threshold issues over which the adjudicated body would have expertise. It says these are the types of issues that could come up. The agency's expertise could be brought to bear. It's not essential. That's the word that the court used in AFI. It's not essential that it be brought to bear in every case in order for that inquiry to be satisfied. What expertise are you imagining on this threshold question of whether a lawful termination decision was even made, a structurally valid termination decision was made? So, I have, I think, two responses. My first response would be, again, it's not necessary that a particular threshold question be brought up in this case that the MSPB would have to adjudicate. But my second point would be, there are some assertions about the interpretation of the statute in the plaintiff's briefing in this matter that could be brought to the MSPB and the MSPB might have a view on it. Can you be more specific? I'm not sure what you're talking about. So, for example, they make an assertion that the CEO is the entity that will make the recommendation for removal and then the advisory board approves the removal. Now, I'm not saying that that's necessarily wrong, but it's not what the statute says. The statutory text we're dealing with very clearly says only upon the approval of the advisory board can the Voice of America director be removed. And then they make some assertions, some allusions to past Supreme Court case law based on what they perceive to be an analogy between an implication of the statute and other statutory themes at this point. Is that at all determinative here? So, Your Honor, I think the broader point I'm trying to make is, again, there's no dispute that the statute requires board approval or, if by five, unilateral action. And that did not occur. So there's, there's not the government isn't defending that. That statute was for the 62 of was fulfilled. It's correct. We're not saying we're not disputing that the statutory mechanism of advisory board approval was not did not occur here. And so, again, I think the important thing to keep in mind is under Elgin. The question is not, is there a threshold issue in this case that the MSPB could deal with before it gets the constitutional issue? The question is, is this the type of claim that could raise those types of potentially those types of the type of claim at what level of generality are you describing the type of claim? Are you just saying it's a re-entaining? Are you saying something about the particulars of this case that make it the type of claim as to which the expertise could be brought to bear? I'm saying it's a challenge to his removal in violation, an alleged violation of a substantive statute. And that is the type of claim that, as the court said in Elgin, that this is the type of claim, a removal claim that is regularly adjudicated. And, yes, we can then look at in more granular detail, the collateralism inquiry, the expertise inquiry, the meaningful judicial review inquiry. But what the courts have said is that that review ultimately in the federal circuit satisfies that meaningful review as long as it's available, even if you raise the constitutional claim. So, your view is any removal claim where the assertion is the removal is unlawful, that goes to the MSPB for Elgin? So, I'm not purporting to speak regarding any possible claim, Your Honor, and I don't want to be to be heard to be saying that. What I'm saying is that this claim, there's nothing about this claim, especially after Elgin, which dealt with this issue of a constitutional dimension and rejected an exception to channeling, especially after that decision. There's nothing about this claim that takes it out of the type of claim that should be channeled. What about the constitutional issue? It had to do with the substantive grounds of the removal. It had to do with a violation of the Selective Service Act, I believe, in Elgin. Right, and so their claim was that the basis for the removal was unlawful. Right, so the man was making a substantive challenge to the terms of the statute and saying it was discriminatory. So, of course, here we don't have a discrimination claim. We have a claim that my, or I'm sorry, that his removal was in violation of a different substantive statute. But I don't see anything in Elgin that would move the needle there. So, in terms, though, of both collateral, the inquiries under Thunder Basin, whether it's collateral and whether it's within the agency's expertise, I read 6205E not to address an employee's interest in his tenure in office as such, but really as a means to guarantee the professional integrity of the government-run broadcasters. And if that's right, then isn't it collateral in the same way, for example, that the process, the issue raised at Maxon was collateral? Because nothing that MSPB does really goes to that. MSPB has no expertise in the professional integrity of government-run broadcast, and indeed, it doesn't. I mean, what's your response to that understanding of 6205E and Congress's purpose in enacting it? So, Your Honor, I think that making that analogy to Axon requires looking at the statute in far too broad a level of generality, among other things, because the key factor in Axon was what the court said was a here-and-now injury of subjection to an unconstitutional process that cannot be remedied later, because later you're done with the process. This is different, because later, if Mr. Abramowitz went to the MSPB, he could seek reinstatement. He could seek back pay. He could seek these types of relief, and that's something also that they— Right, but my question was, well, what about—so, can the MSPB enter any kind of preliminary or immediate relief, TRO, preliminary injunction? Not that I'm aware, Your Honor, although I don't know the exhaustive list. I know they can do reinstatement. I know they can do back pay. I believe they might be able to do fees in some circumstances. So, if—and you may disagree with this, but just go with me for the purposes of understanding your position. If 6205E is intended to prevent interference by, you know, partisan actors wanting to use the Voice of America as a mouthpiece, rather than as objective journalism and having the professional integrity that the Congress was trying to protect, you know, talks about trying to protect in enacting 6205E, if that's the interest, then if somebody is removed in violation of the protections that Congress added in 6205E, it seems important that there be swift response to that precisely to protect the reputation and independence of the broadcasters. And if—and so it does seem like there's a harm that can't be undone if the nature of the broadcasters is changed and the listenership says, oh, we don't trust this anymore, and, you know, the delay actually—it does arguably have a parallel collateral nature and harm that's not remediable by the ordinary relief that the administrative process is capable of affording. So, Your Honor, I have a couple responses to that. I think one of the key words that Your Honor just said was arguably. So there's nothing in this record that shows that the assertions that the plaintiffs make of some harm to the reputation is actually something that has occurred or is going to occur. But I think the more fundamental point is that the statute doesn't say anything about that. It doesn't say, for example, because Congress thinks that if this individual is removed, there's going to be irreparable harm to the VOA's reputation, therefore it must not be channeled. There's no language in the statute that says this is the type of claim that can't be channeled. It just says here's a substantive removal restriction. So that would be my fundamental response. We might— Yes, all right. It doesn't even say it has to be channeled. And we're dealing with implications in both situations. And so I guess the question is, is there enough here to think, you know, this structural safeguard, the purpose of it, supports an intent not to channel as distinct from the kinds of claims that were channeled. And I don't think it's constitutional, non-constitutional. I think it's really about, you know, just what the nature of the claim is and what the nature of the Congress's project is. Well, I don't agree with that, Your Honor, because setting aside the points I just made, I think you could say a similar thing about any important substantive goal that Congress has put into substantive statutes that is allegedly being transgressed by a removal or an adverse employment action. So just because Congress has enacted a substantive statute, presumably many of those statutes are very substantively important. The Federal Labor Relations Act, which I believe is at issue at AFTI, these are all very important substantive statutes, but that doesn't say— So this statute, though, this statute I think is different, and I'd like you to address this, and it's different from Elgin, in that this is a statute about removal. It says you cannot remove unless the advisory board approves. And so because it is so specifically about removal, it seems really different in kind from these other statutes. And the purpose of the statute is to ensure, you know, the independence of the voice of  But the fact that Congress has specifically said you can't remove without, you know, this approval means that you can't get meaningful review of that statutory violation if, in the interim, Mr. Bromwich is removed without that approval, and then it takes years to get through the MSPB. And that is how this is different, I think, or at least one way in which this is different from Elgin. Elgin is not about a removal, and the purpose of that was discrimination, et cetera. This is—which is more, I think, in line with, you know, normal discrimination. I'm sorry, employment cases. This isn't specifically about removal. Congress had an intent about how removal can take place, and it would defeat the purpose of the statute to channel this because the MSPB cannot grant preliminary injunctions or interim relief, and he will be removed in violation of the statute for years. And therefore, it just doesn't seem like Congress could have intended that this be because it defeats the entire purpose of the statute. Again, Your Honor, I think, you know, respectfully, I think if Congress had wanted to make that purpose plain, it could have done so much more easily than it has in this statute, which, again, it sets up a substantive restriction. And I think even you could say in the discrimination cases, the discrimination statutes are—or the discrimination case law that the Supreme Court has promulgated under the constitutional provisions that were at issue in Elgin, those are designed to protect people's substantive rights. And for the duration of any litigation, those rights are alleged to be in harm. MARY JO GIOVACCHINI It's a different kind of statute. It's not about removal, which is what this statute is about. KATHY SULLIVAN It's a different—it is designed to prevent a different type of action or alleged harm, but that doesn't change the fact that Congress hasn't said— the question is meaningful review. Can you articulate what is the meaningful review if this gets channeled? Mr. Obramowicz gets removed. It gets channeled. It takes several years. What's the meaningful review? MARY JO GIOVACCHINI So the meaningful review—so first of all, the MSTD will be able to review his claim. The meaningful judicial review in an Article III court could take place before the Federal Circuit because if Mr. Obramowicz were to lose in front of the MSTD, he could go to the Federal Circuit. And the courts have said, even if you get—the Supreme Court has said, even if you get review at the end of the process— KATHY SULLIVAN It's really about the timing, right? Because this removal statute says you can't remove him without the approval, and in effect, you will have removed him without the approval for five years or whatever it is. MARY JO GIOVACCHINI Your Honor, I'm not seeing— KATHY SULLIVAN I'm not seeing in the statute or the case law that the timing moves the  MARY JO GIOVACCHINI It definitely does. If Exxon said that because the process itself that you're going to go through is the injury, that's categorically not something you can remedy later. KATHY SULLIVAN Exxon suggests that timing is a factor, maybe not the dispositive factor. But, I mean, we are looking at somewhat different, you know, factual scenarios in trying to ascertain ultimately congressional intent. And that's why I'm very focused on this statute and Congress's intent with this statute. And I'm just not hearing any response from you that persuades me that Congress could possibly have intended that this be channeled such that the whole purpose of the statute is defeated. MARY JO GIOVACCHINI Your Honor, my short version of my response is that Congress didn't say that there's a special way we want this— KATHY SULLIVAN All of these cases, they never explicitly say. We're trying to ascertain congressional intent without their explicit saying, we want it channeled or we don't want it channeled. They haven't said in any of these cases what they want. MARY JO GIOVACCHINI But, again, I think that's why Exxon is such an unusual case is because the court went to great lengths to explain why that injury was unique and why it was different from— KATHY SULLIVAN Why is this one unique in a different way? MARY JO GIOVACCHINI Because— KATHY SULLIVAN It's a statute about removal. MARY JO GIOVACCHINI But Mr. Abramowitz is not challenging the process by which that's getting adjudicated. He's challenging the fact that he's— KATHY SULLIVAN I don't understand. I'm just drawing a distinction with Exxon. I believe I'm answering the question, how is this different? And my only point was, Mr. Abramowitz's problem that he's asserting is that he doesn't want to be removed. He's not saying— MARY JO GIOVACCHINI He's asserting that—he's asserting specifically that he was removed in violation of 6205E. So the claim is a 6205E claim. And, you know, you're saying that all he wants is to be put back—let's say he prevails before the MSTB, which it seems like he likely would, and the government decides not to appeal. Then he has no ability, no judicial forum for his claim, right? KATHY SULLIVAN If I understand you correctly, if he prevailed before the MSTB, he could get potentially everything he's asking for. He would get back in the job, but he wouldn't get any opinion saying that 6205E is consistent with Article II, that defeats your merits defense to his termination without the 6205E process, right? You would still—the government would say, hey, no judgment against us on this. Next time, we're going to do it again. Your Honor, I don't think that that is the right way to think about this, because if he prevailed in front of the MSTB, he would have probably everything he's seeking here at that job. JUDGE FRANKIEWICZ He would get back in the job with the same sort of Damocles hanging over him that Congress sought to, you know, hold a little more securely from dropping by enacting 6205E. So then the other heads of the, you know, Radio Free Asia, at least broadcasting, would be thinking, gosh, you know, the professional integrity of the broadcasting activity is not actually protected by that congressional statute the way I thought, because we don't even have a judicial decision holding that it's constitutional, consistent with free enterprise and Morrison. The government is still free to—presumably might still consider itself free to violate 6205E because of its position taken in this litigation that it's constitutionally invalid. JUDGE FRANKIEWICZ Well, Your Honor, I think that would get us—analyzing it through that lens would get us a field from what is presented in this case. JUDGE FRANKIEWICZ We're insistent in answer to Judge Pan that there is judicial relief. We're not in Webster v. Doe territory because there is judicial relief, and that's, you know, that's important to Elgin's analysis. But I'm just saying here, if he gets reinstatement, there's not going to be a chance that he wouldn't be able to seek a ruling on the constitutional question. I mean, Your Honor, I think—well, a couple of responses. I think the MSPB could, in theory, issue a ruling on the constitutional question. As far as some potential future fear among grantees or heads of networks, that is not a claim that is presented in this appeal because all that's at issue is the removal itself. JUDGE FRANKIEWICZ What about Mr. Obama himself? He prevails before the MSPB, goes back to work, and himself is thinking, you know, Congress enacted this law to protect the integrity of my enterprise, but the government has taken the position it's unconstitutional. It's not going to follow it. What protection does this person—so he hasn't really obtained full relief. So the courts have not predicated the determination of whether judicial review is meaningful on whether some future claim might or might not— JUDGE FRANKIEWICZ But look at the nature of the claim that's being brought, and whether it's collateral or—and whether it's in the expertise agency, and also whether it gets reviewed. And so, to me, there is a way of thinking about this statute in which it's collateral. And not in the expertise. And maybe even—although I do think that's a closer issue—maybe even not meaningfully subject to judicial review. JUDGE FRANKIEWICZ So, Your Honor, I think, again, I think we have to deal with the claim as pled and as ruled on. The claim is, I was removed in violation of a statute. I want my job back. I don't want to be removed. And so— JUDGE FRANKIEWICZ In violation of this statute, which is really about protecting the journalistic integrity of Voices of America and the Associated Press, I would love to hear your constitutional—your argument that this statute is not constitutional. Because it seems to me, if you have a multi-member body, that every member of which is removable at will, and even if it's, you know, in a separate—like, Key Cobb is separate from the SEC. The Court—the Special Division of the Court in Morrison was separate from the Attorney General. I don't see why there isn't plenty of precedent to have the sort of, you know, the head for purposes of appointment and removal be different from the head for purposes of supervision. And so I'm just not really sure that under existing law, you have a strong argument that this statute is unconstitutional. But I'd love to hear your argument on that. JUDGE FRANKIEWICZ Right, Your Honor. So in silo law, the Supreme Court said that there's two restrictions on removal authority that our precedents have recognized. It's for a multi-member body of experts, and it's for inferior offices with limited policymaking and administrative authority. There's no serious argument in this case that either of those applies to Mr. Abramowitz. And so the argument is, I think, being made on the other side, that, well, because this type of restriction might impose less of a burden on removal than other restrictions that have been upheld, therefore, it's okay. But the fact remains, and I believe the court said this in silo law as well, a case like free enterprise fund or any of the Supreme Court's other cases is not a standing invitation to create new exceptions. And several times in the last decade or so, the Supreme Court has reiterated these are the two exceptions, and we're not going to go beyond that. And so what we have here is we have the CEO, who's the head of the agency, who the Voice of America director reports to, does not have the authority to remove him. Instead, Congress has set up an independent body. The statute says that the advisory board exists as an independent entity within the executive branch under 5 U.S.C. 104, and that independent body is given final say over the removal. I haven't seen- I'm sorry, what's wrong with that? Because it's a head of department. Like, under the case law, a head of department can remove an inferior officer, which Mr. Abramowitz is. The advisory board is a head of department, and it has authority to remove Mr. Abramowitz. Why is that not just a straightforward application of the law that's come before? It's a head of department's authority to remove the inferior officer. That's allowed. It's not the head of the department where Mr. Abramowitz is employed. That would be the CEO by statute under- I mean, it can be, because you're allowed to have interbranch types of departments and appointments, and it can be. And it's been given all of this authority to- it has to not only- it's not just removal authority. It has to consult with the CEO. It has to do all these other things with the CEO. Like, why isn't it the head of the department? Well, Your Honor, I don't think even the plaintiffs are arguing it's the head of USAGM. That's- Do you- I'm sorry. I just- well, it's a head of department that has authority to remove him. Under the statute. But that's the problem, is that Congress- there's no precedent that I've seen in their papers, in my research, anywhere, for saying, we're going to diffuse removal power between the head of the department where you work and the head of this independent entity that isn't even in the hierarchy. All the cases they cite that, as far as I was able to tell- But there's authority that says interbranch appointment authority is fine. Like, Morrison v. Olson, other ones. Like, there's no problem with that interbranch aspect of this. Well, Your Honor, I mean, so Morrison didn't bless a scheme like this. No, but it stands for the proposition that interbranch appointment authority is okay. Well, Your Honor, I mean, so I disagree with reading Morrison that broadly, but setting that aside- I'm just saying that I don't think that there is- that there is authority for your position, because free enterprise is very different, and that's what you're relying on. And the one layer of at-will removal from the president and the fact that this is a department head seems all in line with case law. I think it requires over-reading and extrapolating too much from those cases, because, you know, there's no dispute that none of those cases decided a structure like this. The question is, is this more like those cases, or is this more like something we've never seen that Article II- On that, can I just ask this question on which category it falls into? Do you- I know that you think that it's the head of- that the board would be the head of the wrong department in a way, because you think it's kind of- it's located in the wrong place. It's not in the direct line in the way that you think would be required. But do you dispute that the board qualifies as the head of a department? Again, it could be- might not be the right head of department. So just to clarify, so first I'll answer your question. We're not disputing that they could be viewed as the head of a department. And just to clarify my position, I'm not saying that necessarily, even if they were in the removal restriction would be constitutional, that would be a question that's not in front of us. But to your point, I don't dispute that they could be viewed as a head of a department. I just want to make sure that that's true. And then I know that you still have your argument that even if they are the head of a department, it's still the wrong department or the wrong head. That's right, Your Honor. The wrong something. That's right, Your Honor. It's not the department- it's not anywhere in the chain of command, for example, which might make this look more like some of the precedents at the other side sites. It's an entirely independent entity. And as far as accountability goes, I mean- You said it's true, the special division in Morrison. But you also mentioned you had another argument, which is about whether they're actually exercising executive authority. Whether who is, Your Honor, the advisory board? Whether it's an inferior officer. Give us all your ways of distinguishing Morrison. Well, so my point was after Morrison and after Free Enterprise Fund, the Supreme Court reiterated in FIWA law and reiterated again last year in Trump v. Wilcox that there's narrow exceptions, specifically two exceptions, recognized by the Supreme Court's precedents to unrestricted removal power. And one of those exceptions is not even arguably presented here. It has to do with a multi-member body of experts. The other one is for inferior officers with, I believe the phrase is limited, policymaking and administrative authority. Mr. Bromowitz has significant administrative and policymaking authority. The- I think it's JA-74-77- I'm sorry, don't he have an inferior officer? No, he is, Your Honor. But he is not an inferior officer with limited policymaking authority. And I don't even read the other side to be arguing that he is. Because if you look at the position description at JA-74- I just misunderstood you. I thought you were saying he's not an inferior officer. No, Your Honor, he is an inferior officer. He is, he is. But he exercises significant policymaking and administrative authority and therefore he doesn't fall within that exception. But here, it's much more responsive to the president in the sense that nobody, there's no for-cause protections at all. So, Your Honor, I think- They talked about the multi-member body of experts. That's a for-cause protection, right? Yes. So, I think the issue is that, I think this sort of goes to the point the plaintiff made about burden and accountability. And I don't think there can be any reasonable dispute that this statute, even though there is not a, quote-unquote, for-cause removal restriction, there are a lot of impediments to accountability here. For example, the advisory board, a quorum has to be present for a vote. That quorum necessarily is going to consist of at least one individual from the party in opposition to the party that's running the executive at any given time because it requires, of the six appointed members, no more than three can be from the same political party. I believe that's the language. So, in other words, in order to constitute an advisory board quorum, the executive has to obtain the presence of the opposing party. Also, and if the- It doesn't need their vote. I'm sorry? Doesn't need their vote. No, but requires their, not necessarily, but requires their presence also- The secretary of state and the three co-partisans, I mean, all of them are selected by the president, but the action can take place without any, as you said, somebody who might be opposed, at least if you identify opposition by party membership. I believe that's correct, Your Honor. But the other kind of impediment to standing up an advisory board is that they all have to be Senate confirmed. That, of course, is a process that takes a long time. And if I could come back to Judge Pillard's point, it seems that there are two ways to remove the Voice of America director. One is a super majority of the advisory board could do it without even any recommendation by the CEO, or the CEO could recommend it with a majority of the board approving. And so it seems to me that that, what you call the diffuse path, which is the CEO and then approval, actually aggrandizes presidential power, because with that path, which is the board and the board acting, it can be done with all people of the same party as the president, because the CEO is appointed by the president, and three members of the advisory board, and the secretary of state is appointed by the president. So the CEO could do it, and then three members of the president's party, plus the secretary of state, who's a member of the president's party, can effectuate that removal. Without that, you need a super majority, which is actually defined as five, and you would need at least one person from the opposite party to join in. So to the extent that it's diffused, it seems that it aggrandizes presidential power, if you add in the CEO way to do it. I don't think that's right, Your Honor. I think this is a, this is the statute sets up a means by which Congress sought to restrain the executive's removal. Otherwise, the CEO would be able to remove it. When you compare this to other ways in which this has been done, the concern you have is that this dilutes the president's authority to manage the executive branch, and call the shots, and control what's being done. Having approval by a multi-member department head of a removal, that's been upheld. That's allowed. I know that you have a different argument. It's a different department, but that's okay. And you say, oh, but this is diffused, because there's a CEO that's ahead, and this other department head. But my point is just that the diffused option only aggrandizes presidential power, because it gives him a method to effectuate the removal with all members of his own party, even though the advisory board is bipartisan. Because for the advisory board to do it by itself, it needs a super majority. You would have to get somebody from the other party to agree. The CEO version, you can do it with all members of the president's party. I think the point you're making, Your Honor, aligns with basically the way the plaintiffs are looking at it, which is they're saying, well, this isn't more of a restriction, or this isn't more of a limit on the president's power than these other examples that we've seen, and therefore it's okay. But setting aside the factual points that I already made about the amount of the burden imposed on the executive authority, the problem is that this court would be going out in new territory where the Supreme Court has recently reminded us, we're not inviting making new exceptions to unrestricted removal. This is a new exception to unrestricted removal. And so- Except that it's not, because all the members of the board are removable for any reason. They report to the president. So, and you said, well, you know, he fired them all, so he would have to get Senate advising consent to replace them. But that would be true if, you know, the SEC is supervising somebody, an inferior officer, and the president decided to get rid of them all. It would be a process to get more people. And the more fickle and arbitrary the president is, it might take longer to get people willing to serve. But that has never been viewed as a constitutional defect in Congress having a multi-member head of department and having that multi-member head of department be the decision maker on removal. So, I just want to make sure I'm responding to your question. Which wasn't really asked. So, you were saying, I think as a practical matter, you're right, that it could take some time for the president to stand up a board because he's fired them all. And so he has to have time on the Senate floor to get new people. But all I was saying was that to the extent that we have, you know, it's standard that you can have a multi-member body like the SEC and that it can have removal and authority over inferior officers. It also is, you know, in some sense a practical impediment if the president has fired them all that the president would have to bring them all back in order to be able to effectively remove an inferior officer. So, in any agency, in any commission or body. So, to be clear, I don't think this court even needs to get into weighing, you know, to what extent does something like Senate confirmation requirement impede the president's authority. I don't think the court even needs to get into that. That's the only reason I'm talking about that. I'm pointing to it in response to what I perceive the other side to be arguing, which is that, oh, this isn't really that burdensome. But our top line point is that this is a novel removal structure. The Supreme Court didn't say in Free Enterprise Fund, okay, we think this is okay now that we've gotten rid of one layer for cause protection. Therefore, we can, you know, go for it. Well, they did okay what was left. They okayed what was left. But my point is they didn't say. Maybe more architecture than we even have here. But they didn't say, now go ahead, Congress, and you can make removal restrictions that are analogously burdensome. They didn't say anything like that. Is your position that anything novel is bad? Anything that's novel has to be overturned? Because that's what I'm hearing. Anything that doesn't fall within what has happened before, we cannot uphold it, even if it does not burden the executive in his authority to control the executive branch. No, you're right. I mean, so again, this does burden the executive on its face. But I do hear you saying anything novel has to be overturned. I'm not saying that necessarily. There have, of course, been cases in the past where the Supreme Court has looked at a situation for the first time and has decided up or down. Do we think this is constitutional? What I'm saying is that this restriction, this diffusing between two different elements— So, instead of looking at the novelty, we should be looking at whether it is burdensome on the executive's ability to control the executive branch. I think, Your Honor—so, first of all, I think, Your Honor— Is that a yes or no? I don't think it's either a yes or no. I think it's—you should be looking at whether— I'm sorry, I'm trying to break it down because you keep saying, this is novel, we have to overturn it. When I asked you point-blank if that's true, you said no. And if that's not the case, then what is the operative analysis? It is whether this burdens the executive in his ability to control the executive branch. Is it not? So, you should be looking at whether it's novel. To be clear, I just don't want to be heard to be saying for all cases in the future that might be construed as novel. I don't want to be speaking for any hypothetical case. For this case, you should absolutely be looking at the fact that it's novel. So, just because it's novel, we should overturn it? You should overturn it because it's not within one of the two narrow exceptions the Supreme Court has recognized— So, another answer is yes. Anything that's novel is overturned. I'm saying that this—I'm not trying to be evasive. I'm saying, absolutely, it matters that it's novel because this— And that's dispositive. I'm saying it can be. I think the court doesn't even get there because this case should have been channeled. The court didn't have jurisdiction below. We're not talking about channeling right now. I understand, Your Honor. I have a question about—I mean, the Constitution says that Congress made best appointments as they think proper for inferior officers, as they think proper in the president alone, in courts of law, in the head of the department. As they think proper, the court in Morrison saw as, you know, giving some significant room—maybe it's tendentious of me to say to be creative—but, you know, that it's a judgment for Congress where and how to vest the appointment authority for inferior officers. That seems like, to the extent that what you're worried about is that this is a different combination of acceptable means, locations, personnel to act as head of department, the constitutional language does seem to arguably invite that. So, if I—yes, sorry. If I'm understanding your question correctly, I don't think there's any case that is read as they think proper to say that that means Congress can pick a new head of a new department to do it. Now, I'm not saying the phrase doesn't do any work. Morrison did involve a different structure than this one. And new in its own time. Sure, Your Honor. But I think my point is that as they think proper can't mean that Congress can do whatever it wants because otherwise we would never— And responding to the colloquy you're having with Judge Pan about whether we should read say-la-la as sort of fixing in amber the method, the constitutionally acceptable methods for the appointment of inferior officers. And I'm just looking at Morrison, which talks about the election of the appointee power is a matter resting in the discretion of Congress, you know, as between the functionaries' name. So, there's some understanding by the Supreme Court that Congress has some discretion in how to vest the appointment of inferior officers. So, Congress certainly has discretion to appoint in whether to put that power in the president, in the head of department, or in the court of law. Then there's the phrase, as they think proper. But it's not clear, and it certainly hasn't been established by controlling authorities, that as they think proper means that Congress can put that authority in a separate entity that could be described as the head of department. When the head of the department, USAGM, doesn't have that authority, even though VOA Director reports— But wasn't that true in Morrison that the attorney general was the sort of supervising head, and the special division was the head of department for purposes of appointment? Well, the special division was a special court, I believe. And so— Article III. So, wasn't it here? They're both in the executive branch. So, in other words, it was a different situation because here we're dealing with an executive branch head of department, and there we were dealing with a special court. I think the point I'm trying to make is that was different than a situation where there's already a head of department. And now Congress is saying— The attorney general is the head of the Justice Department, and it was important that Morrison was under some supervision by the attorney general. But the appointing and removing authority was the special division. But I don't believe that the court—I read Morrison a day or two ago, and I don't believe the court said that Congress can set up a new head of a new department and put removal authority kind of split between that new head of that new department and a new— So, we've been talking for a while, a good while, about two issues. And can I just ask you, as an overall matter, there's also a third issue. Yes, Your Honor. So, on that third issue—I don't need to have a back-and-forth, at least I don't on it—I just want to understand where we are in terms of this litigation. The third issue is about the authority of a court to order the reinstatement. That's right, Your Honor. That question has been teed up for the Supreme Court. Yes, Your Honor. If the Supreme Court were to conclude that—which reach a resolution on that issue in line with your position in this case, would anything that we've talked about so far matter for purposes of this case? Well, yes, Your Honor, because even if the court had the authority to order this type of relief in the appropriate way— No, I'm saying the Supreme Court resolves it in your favor. What I'm asking is, if the Supreme Court reaches a resolution on the reinstatement authority— Right, right, right. —with your position, then do the other two issues that are teed up, do they matter? Because you would get a win on that issue as a consequence of the hypothetical Supreme Court resolution, then does anything we've talked about so far, would it matter for purposes of this case? Yeah, I'm sorry. I didn't understand the question. I do now. Thank you, Your Honor. So, we still want a ruling on channeling. You're correct that if the administration wanted the Supreme Court on this issue of authority, that could resolve this issue because it would have to be— What I'm asking is, would it resolve the case? In other words, would we need to do anything else? If the Supreme Court issued a decision tomorrow that resolved the third issue in your favor, would there be anything left to do in this case? Then I think this court could reverse just on that basis and say, District Court, you didn't have the authority to enter this relief. However, we're still asking for reversal on the channeling basis and on the Article 2 basis. I mean, you're asking for reversal. You could ask for reversal on multiple grounds. I'm just wondering, would there be a need or a cause to do anything other than that? I'm just wondering your view on that. Understood, Your Honor. We would certainly submit something to the court if that happened, but if that happened, I believe the court could just reverse on that basis. Why wouldn't we have to just channeling? I'm sorry? Why wouldn't we have to just channeling? Because under the channeling route, we would not be reinstating him. The court would not be reinstating him. We'd be saying, we have no jurisdiction. This has to go to the MSPB. So why wouldn't we have to resolve channeling? So I think you're asking a separate question. So if the court did rule on channeling. The question is, if the Supreme Court were to rule that the court can't reinstate Mr. Bromowitz, would we have to do anything else? And my question to you is, why wouldn't we have to resolve channeling? Because if we go with you on the channeling route, the court's not reinstating Mr. Bromowitz. It's saying the MSPB has to resolve this, et cetera. The court would be saying, we don't even have jurisdiction to reinstate Mr. Bromowitz. It goes to the MSPB. So why wouldn't we have to resolve that? I think you could resolve that. I think that. Well, we have to. I don't think you would have. I don't think you. Even though it's jurisdictional. So that's the upshot of the question is. Right. You would win on the ground. And you would get, I think you would get full relief because what the district court ordered and you object to is the reinstatement. Right. And so that's my point because we're asking for the summary judgment decision to be reversed. I think your honors could reverse it on that basis. Now, it would probably be cleaner to also reach the jurisdictional question for the reason you mentioned as well, even assuming there were a decision because it is a jurisdictional question. Would we have to? I think that's where I think both of us. I think if you don't, the district court is going to still think it has jurisdiction over the substantive claim and it shouldn't. So that would be a problem. And that's why we're. It wouldn't matter to you because nothing would happen with that substance of claim. If there couldn't be a reinstatement anyway, I guess it seems to me it's just a legal question whether in a situation like this, the jurisdictional issue has to be reached. Even if the Supreme Court resolves a third ground, which I think would give you a whole whole relief in your favor, would we not, would we not be able to get to that third question? Because there's a threshold jurisdictional question about channeling or in this kind of context with the fact that you would win on a third issue, obviate the need to even deal with jurisdiction or the steel company and its progeny say, no, you got to deal with the jurisdictional question no matter what. So I think probably the short answer and the thing I should have said five minutes ago is that I would request supplemental briefing in that circumstance, but I appreciate the questions and I understand where you're getting at. There is a problem. We can hear from the other side, but there is a problem with if we were inclined to think that statute 6205E is constitutionally valid, then there has been no removal. So whatever the Supreme Court would hold in Harris, there's no need to reinstate someone who hasn't been removed. Well, I mean, so if I am understanding correctly, I think we still have the problem that what the district court purported to do, assuming the Supreme Court were to rule and slaughter that that's not a remedy that's available, the court's order would be invalid under that holding. So he would have to, in theory, you could imagine a remand where if the court had jurisdiction, and I'm not saying it does because our position is that it didn't, but if it did, then it would have to go back to the drawing board depending on what this court's order said. But I, again, I think if the Supreme Court issued a decision tomorrow, we would request supplemental briefing on what to do now. I'll make sure my colleagues don't have additional questions at this time, and we'll hear from the other side. Thank you very much. Thank you. Shultz. Thank you. May it please the court. So I think, as we know, the issue in this case is whether the director, the voice of America, can be fired by the CEO of the U.S. Agency for Global Media when the statute says she can only be fired by the International Broadcasting Board, whose members are removable by the president with no foreclosed protection. Both the jurisdictional issue, which you've been discussing, and the appointments clause issue are informed by the statute that Congress enacted in 2021, which was designed to protect the director of Voice of America and the other networks from exactly what happened here, namely the firing of the director by the CEO of the U.S. Agency on Global Media. That statute was a reaction to events that occurred in 2020 when a new CEO of USAGM abruptly fired several network directors, prompting a strong reaction from Congress. And this included a highly critical bipartisan letter from seven senators stating that this action threatened the network's core mission, which is, quote, to act as a bulwark against disinformation and credible journalism and undercut the credibility and independence of the networks. The mission shows there's a core tension in your position, which is that, on the one hand, CC205E is intended to protect the independence of Voice of America, but it doesn't actually render it at all in any meaningful way independent of the president. So, I mean, if the objective is to shield it, then hasn't, doesn't that cut in favor of the government's position on the constitutional point? I don't think so, Your Honor. I mean, I mean, we first look, I think what Congress did, and, you know, Congress was concerned that the independence would be impaired if the CEO could, on a whim or for any reason, fire the director of these networks. That was Congress' concern, and they addressed it. I mean, maybe they could have made the OA an independent agency. They didn't do that. They addressed it by empowering the seven-member board appointed by the president, confirmed by the Senate, to have the sole power to appoint and remove the network directors. I'm not arguing that that gave VOA complete independence, but it was the step toward independence that Congress chose in reaction to what had happened in 2020. What if Congress had vested removal authority in a board of 20 that had to be unanimous? Constitutional or not? I'm not seeing how that would be different, but maybe I'm missing something. As long as they're at will, your theory is as long as they're at will, yes, that's still not a constitutional. Yes. I mean, the president's authority to appoint the board remains. It probably helps us that it's not unanimous. What if they had to all be of, or a majority had to be of the opposing party as a check to make sure that they're more independent? I don't know. I have to honestly say I don't know the answer to that question. I mean, that raises The opposing party part that creates the issue, because it sounds to me like you think as long as, it's not just as long as it's at will, because if you interpose that will, but with some being an opposing party, say a majority being an opposing party, that that might be a constitutional problem. I don't know. I mean, the president gets to appoint all these members, right? And so the president can pick whoever he wants, as long as it's balanced, which is an arrangement we have throughout government. Right, so he can pick whoever he wants, but can pick whoever he wants subject to the conditions laid out. Subject to, yes, and subject to Senate confirmation, but he has wide range in making this selection. I think it would be a little odd to say some have to be from the opposing party, particularly since they serve across presidential administrations. I don't even know if you could, how you would do that. But I think that raises an issue that we don't really have here as respectfully. When it doesn't matter how many layers of at will, suppose it's 20 layers of at will you have to go through. 20 multi-member boards, they're all at will, but it's 20. Well, it seems like it would matter, yes. I'm not saying what's constitutional and what's not. Yeah, I'm just trying to understand the principle that you have for dividing what's constitutional or not. And that's obviously the purpose of taking out these hypotheticals is just to know at what point, because I think it's got to be true that the whole point of the existence of this board was to make removal more difficult. In your view, I'm not saying that necessarily means unconstitutional, but your point is, well, sure, it was meant to make it more difficult, but in a way that was important, and it didn't get to a level where it unconstitutionally impinges on the president's removal power. That position is totally coherent, but I guess I'm just wondering at what point does it impinge on the removal power? What's the principle that tells us, I think that what really helps us here is the case law. And so in Morrison versus Foster, as the court knows, Congress had an arrangement, maybe different purposes, but where the judiciary made the appointment, maybe it was looking for independence, but the special counsel was supervised in the Department of Justice. And that same kind of arrangement was held in another Supreme Court case, ex parte Siebold, where the judiciary appointed an election official, election officials, but they were supervised in the Justice Department. And that case also talks about U.S. marshals, which in some cases were appointed by the court, supervised by the Justice Department, but worked in the court. So these kinds of inter-branch arrangements have been blessed, and our position would be an inter-department division like this can't be more problematic than an inter-branch one. And the court has, you know... I understand that argument, and it has force. I guess the question is, and understandably, you're not even prepared to say that every inter-department condition on removal would be okay, because if it's opposing party majority in 20 layers, but it's inter-department, I think you're suggesting that it could be a different question, understandably. Yeah, I think it is. I think what we would say, the burden on the president here is minimal, and it's throughout the government. I mean, if the president wants to fire an administrative law judge in the Security Exchange Commission, and the commission doesn't want to do it, his only remedy is going to be to fire enough commissioners and get them reappointed to get his way. And this is true in other agencies as well. And so I think our main point is the burden here is comparable and less than what we see in the government and what the Supreme Court has endorsed in the two cases that I just mentioned. We've sort of jumped ahead to the constitutional issue without asking you about some of the discussion. No, I thought that that just wasn't going to be a problem. So I have a question about, so Bronowitz is both an superior officer and senior executive service. If he were not in senior executive service, would the CSRA still apply? I don't think it, I'm not an expert, but I don't think it could apply if he were not. I mean, not every officer appointee is an SES, right? That's a career designation. Yes, yes, yes. And he has that career designation. But he could be otherwise, could be just the head of Voice America, director of Voice America without being that. I think that's true, yeah. And if he could bring the 6205 claim in district court, does that preclude him from bringing a claim to sort of protect his personal interest in MSPB? Or does it? I don't know. I mean, we felt he had to make a choice. And the problem with the MSPB is it doesn't work. And I like to, maybe I could explain that, talk a little bit about the underbasin factors, because I think that's what's critical. So as the court knows, the whole reason you do this analysis is to figure out the congressional intent, Judge Pan's first question. That's what we keep coming back to. What would Congress have intended? Would they have intended that this kind of claim go through federal court or go through the Marist System Protection Board? And the three factors I want to stress, you know, it's in our briefs and probably everybody knows it, but they're guideposts. You don't have to, Judge Kagan, Justice Kagan, I think said in Axon, you don't necessarily have to win on all three, although we think we do. And I'll explain why. You think you do win. You don't think you do have to. Right. Yeah, exactly right. And are they exhaustive? I mean, they're just suggestive, right? Other things matter. So I think, at least in our case, we can get the other things within the consideration of those factors. But the first one, which is, you know, always takes the most time, is meaningful judicial review. And here, the problem with delaying judicial review is really not different from the problem that the Supreme Court was talking about in Axon, because during the time of the delay, the VAOA will be operating illegally. They'll be operating without the director that Congress intended be there unless removed by this board, which hasn't happened. And so during that whole period of time, you know, maybe two years, three years or more, the law is being broken. And you can't, just like in Axon, you can't remove... Isn't that true for every time somebody gets removed unlawfully and therefore they're not in their position? It may be, but I think the difference here was that Congress's whole purpose was for the VAOA to operate with this independence. And if you require going through the MSPB, then every time a network director is fired, you know, you get this long delay and you essentially nullify the statute. Because what does it really mean if the director could be removed for some number of years, maybe as long as an administration? But if you had a statute that bars, just hypothesize a statute that deals solely with removal and it bars discriminatory removals, and then you had somebody that claimed they were the they were removed in violation of that statute that bars discriminatory removals because they were removed for a discriminatory reason, do you dispute that that would have to go to the MSPB? I think so. I mean, there is one exception for certain kinds of civil rights cases, but a lot of those, you know, certain kinds of discrimination could. And the employee can get that pay. That's the remedy. But I mean, here, you really don't have anything left of the statute, or very little, if you allow this. So my only point, Chief Judiciary Ombudsman, is that this goes against the congressional intent. And the whole thing we're looking at here is the congressional intent. You're not really, I mean, it's, you're not really making a First Amendment argument. It has overtones of that, where arguably, I mean, I get run away by your friend on the other side, but if one thinks that there is a free expression, freedom of the press kind of interest that Congress was pursuing in enacting the statute, it isn't technically the freedom of the press, it's government speech of a sort that Congress thinks should kind of mirror a free press, in a way. Does that shape, does that help you distinguish other delayed relief from what one would think Congress intended here, or not? I mean, I think it may. I mean, the whole point of Voice of America and these other networks, and the whole point of what Congress did was to foster some independence from political appointees and to foster really a network, a news organization that could operate like news organizations do, without that kind of interference. And I think maybe that does help us. I mean, again, I would say it's like AXA. If Bramwood goes through this MSPB process and prevails, there's still, back pay is not going to help him. There's still no remedy for the time, the long time, where the agency was operating without a duly appointed director. So give us your most crisp argument for why we shouldn't take this statute to create a substantive standard that MSPB has to apply, like the Constitutional Equal Protection Clause provides a substantive standard that the MSPB in Elgin had to apply. So no reason to exempt Abramowitz from the usual scheme. So, first of all, Elgin involved an employment statute. We have no employment statute here. We're, really, the statute is... Employment and removal is a form of employment. He was removed under an employment statute that said he had to comply with the second, the Selective Service. But I think more important... Wait, but isn't Abramowitz the letter saying, you know, you go through all the factors. You've been basically unwilling to serve the interests, as the CEO defines them, in going where our need is greatest, which is Greensboro. And so that's an employment, it's put forward as an employment decision. You're the big guy and you're not acting like the big guy. So we don't want you. Right, but he... That's an employment decision. Yeah, I'm not saying it wasn't. I mean, yeah, he's an employee at some point, but you asked me for my most crisp answer. Yeah. Let me give it to you. Okay, but... So... Okay. In Elgin, in addition to the constitutional question about the constitutionality of the Selective Service, the court says at the end of the opinion, there are, quote, many threshold questions that may accompany the constitutional claim, including, now I'm not quoting, but including preliminary questions unique to the employment context, such as whether this employee was constructively discharged. And essentially, and then it says, and the resolution of those decisions could avoid ever having to even get to the constitutional issue. That's a very different context from what we have here. There is one issue here. It's the constitutional issue. The MSPB has recently said they don't decide the constitutionality of statutes. And so I would say we're in a very different situation than Elgin. Because I'm fine. If this were a case in which there was somebody other than Mr. Obama directing Force America, the person was, you know, running amok, embezzling, and the CEO said, you're out, and allegedly embezzling, and you're violating, you know, civil service, or you're acting, whatever, conflict of interest, whatever is under civil service, but really bad action, you would have both. So you're... You would have what? You would have both something that might be susceptible of consideration. It would be like Elgin. There would, you know, maybe they decide, oh, that was all rumor and false. You get your job back. Obviate the need to reach. I think you... People of higher education. So that's a very case-specific reason you gave, because you could see a case in which they were both sort of run-of-the-mill employment claims, and... But his... You could, but his argument would be, I can only be removed by this board. I can't be removed by the CEO, either because I didn't accept a transfer or for whatever reason. That all has to be done by the board appointed by the president and confirmed by the Senate. Just the way if there's a problem with an administrative law judge, that judge in the SEC, that judge has to be removed by the SEC. Can't be removed by the president or somebody else. I should say a word about the collateral and expertise test. I think those are actually pretty simple in this case, although maybe I'm probably wrong with your questions. But I'm sure this is collateral to what the CSRA is designed to address, which is, you know, it's an employment statute, and it's collateral to the work of the MSPB. And just as an accident, again, where the court said that the plaintiff's claims don't address procedural and evidentiary matters ordinarily handled by the Security and Exchange Commission, or in the Federal Trade Commission. Here, the plaintiff's claims do not have any relationship to the employment matters ordinarily handled by the Merit System Protection Board. And so, we think there's really no difference on the issue of collateral between what's going on here and what went on in Exxon. And the expertise, I think, is the same. The MSPB doesn't pretend to have expertise on these types of constitutional issues. And, in fact, it recently said in an opinion, and this has been a longstanding position, that it doesn't decide the constitutionality of federal statutes. And Justice Thomas basically said he understood that was their position in Elgin. So, it's sort of long and well accepted. Again, in Exxon, the court said, this is the court, the commission, the SEC, knows a good deal about competition policy, but nothing special about separation of powers. And we think the same is true here. The MSPB knows a good deal about employment policy, but nothing special about Article II of the Constitution. So, is it correct, as a procedural matter, that if this were channeled, the MSPB would just not rule on the constitutional challenge, the constitutionality of the statute, and it would just wait for the federal circuit to review it to know the law? I mean, my understanding is the first go to an administrative law judge. I don't know what the administrative law judge would do. But would they rule on the constitutional? I don't know. I don't know. But I think, based on the history, after whatever time it took, once it got to the MSPB, and after whatever time it took them, based on the history, they would not rule on the constitutional issue. Because, frankly, they don't have the expertise, and it's collateral to the work that they do. Well, do we know anything about the relative delays in processing through MSPB versus district court? This seems like an easy question for MSPB. They'd say, statute says, got to get the majority of the board. If they didn't go to the board, you win. And then the government would go to the federal circuit and say, actually, that statute's unconstitutional. And that would probably be no slower than something to district court in coming to us, or would it be? Well, the district court can act very quickly, as it did here. You know, and in another situation, a district court can grant preliminary relief, which the MSPB can't do. I mean, that, you know, that difference has been identified in a number of cases. I mean, in Thunder Basin and in the AFGE case in this court, which is relied on very heavily, you know, there the argument was preliminary relief. The difference between those cases and this case, in those cases, the administrative agency had expertise to decide the issues. But here, I think the preliminary relief that a district court can grant is really critical to protecting the statute. And, you know, I mean, it wouldn't go to the administrative law judge until, you know, you get in line. I don't know. The administrative law judge might decide the issue. I don't know. But from everything I can tell, the MSPB, they'd have to change their policy to decide this kind of thing. But either way, they don't have the expertise, and it's clearly collateral to the kind of work that they do. I'm sure my colleagues don't have additional questions. Okay. Thank you, Mr. Schultz. Thank you. We'll give the government three minutes for a rebuttal. Thank you, Your Honor. Just a few quick points to reiterate and to respond to the other side. So, I just want to go back to Exxon really quickly. Exxon actually distinguished Elgin on the basis that in Elgin, that was a challenge to a specific substantive decision, such as, quote, firing an employee. And then it distinguished the case that it was before the court in Exxon saying the plaintiff's claims are, quote, instead challenges, again, as in free enterprise fund to the structure or very existence of an agency. On the collateralism, or I'm sorry, on the adequate judicial review factor, the court then said adequate judicial review does not usually demand a district court's involvement. Review of agency action in a court of appeals can alone meaningfully address the plaintiff's claims. And then the court went on to explain why that wasn't the case in that instance, and that was because of the unique harm, the here and now process harm alleged by the petitioners in that case. And you distinguish that by saying that here the Article 2 point is being raised by the government, but does that matter? Because the problem is to say the structure of very existence of the decision maker is at issue. It's just the flip side of the same, actually, the very same kind of question. So who makes the decision that the plaintiff is subject to, and is that constitutionally structured, that decision maker? So is that really just exactly analogous, but flip side? Your Honor, it's different because Mr. Abramowitz is saying I was removed by the wrong person. The Exxon petitioners were saying the process through which we're going to be required to adjudicate our substantive grievances is itself unconstitutional. Well, he's saying the process of the firing was itself contrary to Congress's dictate, and the government is saying, oh no, constitutionally that was wrong. So there's a question about removal, about accountability in both cases, but here Abramowitz is saying Congress has the authority to create the structure that protected me. The executive is wrong to blow it off, and there the plaintiffs in Exxon in those two cases were saying that the entity that has ability to make decision over me is Congress's wrong to create it this way. The executive is right, but it's the same structure, is it not? No, Your Honor. I think what would be closer to that would be if Mr. Abramowitz was challenging the constitutionality of the MSPB process, which I realize we already discussed, but that would look much more like what happened in Exxon. So your argument is a one-way ratchet. If you're talking about the limitations on executive authority or accountability, then it's collateral and out of the expertise. If you're talking about the permissible exercise of Congress's power over these decisions, then it's not. No, I don't think that's what I'm saying, Your Honor. I'm saying what was really driving the court in Exxon was the nature of the harm and the fact that it couldn't be remediated later. And so I think, you know, kind of just segue to another point. What Mr. Schultz's point that what cannot be remediated later is the loss of over this period of time. So I think equivalent to these immunity cases that are cases. Right, Your Honor. So I think that that bleeds into the chief judge's question to my friend on the other side, which is couldn't anyone who's removed, I'm paraphrasing, Your Honor, but couldn't anyone who's removed argue that a statute's purpose is being violated for the duration of their removal? And of course they could make that argument, but that still says nothing about where the challenge should be. No, this question is about remediation. You can argue that normally reinstatement and back pay, et cetera, is considered adequate to compensate somebody who's before the MSPB. But I thought you were saying that in Exxon there's a structural issue that, you know, once you've gone through the process, you've already lost that interest. And Mr. Schultz was saying what's equivalent here is the loss of independence of Voice of America. You can't get it back. So it's the rep who can't remediate it. And that's why this is different from those typical MSPB cases where you get back pay, you get reinstatement, that's enough for you. Not here. So respectfully, Your Honor, I disagree with that characterization because, again, it is he could, as you noted, he could get the reinstatement, he could seek the back pay, but he's not vindicating some broader interest, some purpose of Congress. He's vindicating his interest in his job. That's what would be before the MSPB. That's what was before the district court. Yeah, but you're sort of evading the question because that is one thing that's before the MSPB. But Mr. Schultz's point is that there is this other thing that cannot be by the MSPB, which is intended by the statute that he's relying on. I think maybe what I am trying to articulate is that Mr. Abramowitz is not the party to, he's not a party bringing a claim that can remediate that in any forum. His claim is I shouldn't have been removed. I want my job back. And so maybe this just goes back to congressional intent then? Well, Your Honor, I think who stands for the proposition that Voice of America would lose its independence allegedly, arguably. That is what Congress was intended to address with this statute. Mr. Abramowitz is saying you're firing me in violation of this statute. Mr. Schultz is saying there's an issue here that cannot be remediated by the MSPB with its normal remedies. And you're saying nobody can vindicate that intent of Congress? No, Your Honor. I'm saying that what we might or might not feel was the intent of Congress can't vary the fact that Congress made a substantive restriction, but it didn't purport to vary the background presumption that these types of claims go to the MSPB. And that's what I'm saying. I'm saying you can't use what you think is the intent of Congress to say this should also go to the police. But the whole ballgame in this whole analysis is Congress's intent. I think that's a weakness of the other side's argument, Your Honor. They're making a very strong pitch in their view for the intent of Congress that that can't vary what the statute does and does not require. So that's why I'm sorry. In determining what the statute does or does not require, we're analyzing what Congress would have intended, whether Congress would have intended that this claim be channeled. It's all one in the same analysis. So I'm not understanding your answer. My answer, so my answer is that in the statute, in Title 22, which is where 6205 is, Congress didn't channel, didn't take the claim out of channeling. And this is the quintessential type of thing. This is a question we're trying to answer whether they did or didn't. And it's not explicit, but it's never explicit. I guess I don't know if I have another way to answer your question, Your Honor. I think, again, I think that to the extent the other side is using the perceived intent of Congress to tell this court where its claim should be heard in the first instance or where Mr. Brown's claim should be heard in the first instance, it doesn't say anything about that. It says this is a substitution. Are you disputing that that's the whole Thunder Basin analysis that we're trying to ascertain the intent of Congress as to whether this claim should be channeled? No, Thunder Basin, I'm not, I don't think that I didn't understand myself to be disputing that Thunder Basin sets out ways to get at the intent of Congress, and I've been talking about Elgin, which follows Thunder Basin, and Axon, which follows the Thunder Basin inquiries. I'm not disputing we're under Thunder Basin, but I think my point is that the type of analysis in which the plaintiffs are asking this court to engage is not something that's been blessed by Axon or Elgin or Thunder Basin. So I think if we're going to look at the intent of Congress, we should do it in the way that the Supreme Court has done it, which is look very closely at the type of harm being asserted and the type of relief being sought. The type of relief being sought and the type of harm being asserted here are quintessentially the types of things that the MSTB deals with all the time. So with that, I would ask the court to reverse. Thank you very much. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Pillard; Pan